AO 91 (Rev. 11/11)  Criminal Complaint

**LODGED**
CLERK, U.S. DISTRICT COURT
4/2/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: _____LM_____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
April 2, 2021
CENTRAL DISTRICT OF CALIFORNIA
BY: _____KC_____ DEPUTY

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| Paris Denise Thomas | ) | 5:21-mj-00243 |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _June 2020 to December 2020_ in the county of _San Bernardino_ in the _Central_ District of _California_, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18, United States Code, Sections 1040, and 1343 | Fraud in Connection with Emergency Benefits Wire Fraud |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Amy R. Pfeifer, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _04/02/2021_

_____
*Judge's signature*

City and state: _Riverside, California_

Honorable Magistrate Judge Sheri Pym
*Printed name and title*

*AUSA:* B. Tuay, (213) 440-3141

**AFFIDAVIT**

I, Amy R. Pfeifer, being duly sworn, declare and state as follows:

## I. <u>INTRODUCTION</u>

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have served in this capacity for 16 years, since December 2004.  I am presently assigned to the FBI Riverside Resident Agency white collar squad.  My responsibilities as an FBI Special Agent include investigating unemployment insurance fraud, mail fraud, identity theft, as well as other related crimes.  I am a graduate of the FBI Academy in Quantico, Virginia.  As part of my training at the FBI Academy, I have received over 25 weeks of instruction in the fundamentals of law, ethics, behavioral science, interviewing, report writing, firearms, surveillance, defensive tactics, and case management.  I have also received instruction in the identification, collection, and preservation of evidence, photography, fingerprint collection and crime scene investigation.  I have completed thousands of hours of criminal investigations, including compiling information, interviewing victims, witnesses and suspects, and collecting evidence to support the filing of criminal complaints and search warrants.

2.    I have also completed training in the investigation of white collar investigations including unemployment fraud, money laundering, health care fraud, and identity theft.  Through the course of my employment with the FBI, I have directed and participated in white collar investigations involving

unemployment insurance fraud, identity theft, securities fraud, health care fraud, public corruption, bank fraud, wire and mail fraud, and money laundering.  Before my employment with the FBI I was employed as a social worker.

3.    Through my training and experience, including my discussions with other law enforcement officers experienced in investigating crimes involving unemployment insurance and benefits fraud, I have become familiar with the methods used by people who commit benefits fraud offenses.

## II.  PURPOSE OF AFFIDAVIT

4.    I make this affidavit in support of a criminal complaint against, and arrest warrant for, PARIS DENISE THOMAS (year of birth: 1987) for violations of Title 18, United States Code, Sections 1040 (Fraud in Connection with Emergency Benefits) and 1343 (Wire Fraud).

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  BACKGROUND INFORMATION ON UNEMPLOYMENT INSURANCE BENEFITS AND COVID-19-RELATED FRAUD

**A.  Unemployment Benefits**

6.   Since 1935, the DOL's UI program has provided unemployment benefits to eligible workers who become unemployed through no fault of their own.  This program ensures that at least a significant portion of the necessities of life -- most notably food, shelter, and clothing -- are met on a weekly basis while the worker seeks employment.  UI beneficiaries who meet the requirements of the applicable state law are eligible for this temporary financial assistance.  Each state administers a separate UI program within the guidelines established by federal law.  In the state of California, the EDD administers the UI program for residents and others physically performing work activities in California.

7.   Generally speaking, regular UI claimants must be: (1) unemployed through no fault of their own; (2) able and available for work; (3) willing to accept suitable work; and (4) actively seeking work.

**B.  PUA Under the CARES Act**

8.   On March 13, 2020, the President of the United States declared the COVID-19 pandemic an emergency under the Robert T. Stafford Disaster Relief and Emergency Assistance Act.  On March 27, 2020, the CARES Act was enacted to provide emergency assistance and health care response for individuals, families, and businesses affected by the COVID-19 pandemic.  The CARES Act included, among others, the establishment of (1) PUA benefits to

provide financial assistance to individuals who are out of work due to the pandemic, including those who do not usually qualify for regular state UI such as self-employed, contract, and "gig workers," (2) the Pandemic Emergency Unemployment Compensation ("PEUC") benefit, a 13-week benefit extension for people who have used all benefits available in their regular UI claim, and (3) the Pandemic Additional Compensation ("PAC") benefit, an additional $600 federal stimulus payment automatically added to each week of benefits received between March 29, 2020 and July 25, 2020.

9.   On August 8, 2020, after Federal Pandemic Unemployment Compensation ("FPUC") expired, the President signed a Presidential Memorandum authorizing the Federal Emergency Management Agency ("FEMA") to use disaster relief funds pursuant to Section 408 Other Needs Assistance of the Stafford Act to provide supplemental payments for lost wages to help ease the financial burden on individuals who were unemployed as a result of COVID-19.  The "Lost Wages Assistance Program" ("LWAP") served as a temporary measure to provide an additional $300 per week via a total of $44 billion in FEMA funds.  The period of assistance for LWAP is August 1, 2020 to December 27, 2020, or termination of the program, whichever is sooner.

10.  On December 27, 2020, the President signed into law the Consolidated Appropriations Act of 2021.  The guidance provided states with important information about several provisions of the law, including the extension of programs first

authorized by the CARES Act earlier in the year, as well as the creation of a new UI benefit for "mixed earners."

11.   The law extended the PUA program created by the CARES Act, which provides UI benefits to gig workers and others not traditionally eligible for them.  Under the law, the end of the period of applicability for the PUA program extended to those weeks of unemployment ending on or before March 14, 2021.  In states where the week of unemployment ends on a Sunday, the last payable week of PUA was the week ending March 14, 2021 (March 13 if weeks of unemployment end on Saturday).  For individuals on PUA who have not exhausted their benefit eligibility of up to 50 weeks, the program also provided for continuing benefits for eligible individuals for weeks of unemployment through April 5, 2021.  The law also strengthened documentation requirements to ensure PUA program integrity.

12.   Additionally, FPUC, which expired July 31, 2020, was reauthorized and modified to provide $300 per week to supplement benefits for weeks of unemployment beginning after December 26, 2020 and ending on March 14, 2021, which was extended to September 4, 2021 by the COVID-19 Relief Bill.  FPUC was not payable with respect to any week during the gap in applicability, that is, weeks of unemployment ending after July 31, 2020, through weeks of unemployment ending on or before December 26, 2020.

13.   In addition, the time period for receiving the PEUC benefit was extended from December 27, 2020 to March 14, 2021, then through September 4, 2021, and the number of weeks that an

individual could claim PEUC benefits was increased from 13 to 24 weeks.

14.   Prior to the enactment of the CARES Act, to be eligible for UI administered by the EDD, a person must have been employed and worked in California and received at least a certain amount of wages from an employer in the 18 months preceding his/her UI benefits claim.  Because of this requirement, self-employed workers, independent contractors, and employees with insufficient earnings were not eligible to receive regular UI benefits.

15.   The CARES Act established a new program -- PUA -- to provide unemployment benefits during the coronavirus pandemic to people who do not qualify for regular UI benefits including business owners, self-employed workers, independent contractors, and those with a limited work history who are out of business or have significantly reduced their services as a direct result of the pandemic.  UI benefits provided under the PUA program are sometimes referred to as PUA benefits.

16.   Under the PUA program, workers who are not eligible for regular UI benefits but are unemployed or partially unemployed for a COVID-19-related reason[1] permissible under

---

[1] COVID-19-related reasons for being out of work include: being diagnosed with COVID-19 or experiencing symptoms of COVID19 and seeking a medical diagnosis; being unable to work because a health care provider advised self-quarantining due to concerns related to COVID-19; having a household member who has been diagnosed with COVID-19; providing care for a family or household member who has been diagnosed with COVID-19; having primary caregiving responsibility for a child or other household member who is unable to attend school or another facility that is closed as a direct result of the COVID-19 and the school or

federal law may receive unemployment benefits for up to 46 weeks.  Under the PEUC program, workers who are eligible for the regular UI benefits for up to 26 weeks may receive an additional 13 weeks of benefits for a total of 39 weeks, which was later increased to a total of 50 weeks.  Under the PAC program, for an individual receiving a regular UI benefit, a PUA benefit, or a PEUC benefit between March 29, 2020 and July 25, 2020, the EDD paid an additional $600 in CARES Act funds for each week of benefits.  Between December 26, 2020 and March 14, 2021, the FPUC program provided an additional $300 per week for unemployment.  Examples of non-business-owner occupations that may qualify a person for PUA benefits include realtor, barber, hairstylist, freelance photographer, construction handyman/woman, gardener, and ride-share driver.[2]

17.  The California EDD began accepting applications for PUA benefits on April 28, 2020.  Applications may be made online from any digital device, including smartphones, that connects to the Internet and is capable of accessing the EDD website's UI benefits page.  To make benefits available as quickly as

---

facility care is required for the claimant to work; becoming the breadwinner or major support for a household because the head of household died due to COVID-19; the claimant has quit his/her job due to COVID-19; the place of employment has closed due to COVID-19; a job that the claimant was scheduled to start is no longer available due to the COVID-19 public health emergency; or the place of employment is inaccessible due to the COVID-19 public health emergency.

[2] To be eligible, such person must also not be participating in the UI Elective Coverage program. Under the provisions of the California UI Code, employers may elect UI and State Disability Insurance (SDI) or only Disability Insurance coverage for themselves. Self-employed individuals, who are not employers, may only elect SDI coverage for themselves.

possible, payments are issued in phases.  If a claimant qualifies for PUA benefits, the minimum payments are as follows based on the claim's start date:

    a.    <u>Phase 1</u>: For claims with start dates from February 2 to March 28, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.

    b.    <u>Phase 2</u>: For claims with start dates from March 29 to July 25, 2020, $167 plus $600 per week for each week the claimant is unemployed due to COVID-19.

    c.    <u>Phase 3</u>: For claims with start dates from July 26 to December 26, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.

18.  PUA applicants may be eligible for more than the minimum weekly benefit amount of $167 if their annual income for 2019 reported on the PUA application meets a minimum threshold.

19.  Persons applying for PUA benefits do not need to submit any supporting documents to the EDD with their applications.  Claimants enter their total income for the 2019 calendar year on the application.  The stated income will be used to pay the minimum benefits of $167 per week.  The EDD may request documentation to provide proof of the stated income.[3]  If the income information provided by the PUA claimant meets an annual earnings threshold of $17,368 or more, the EDD will work as quickly as possible to verify the claimant's income using

_____

[3] In general, the EDD accepts items such as an annual tax return, 1099 forms, W-2s, and pay stubs as proof of income.

other resources available to the EDD in order to increase the PUA weekly benefit amount.

20.  Like regular UI claims, PUA claims can be filed online.  When an individual files a PUA claim online, the EDD automatically maintains certain information regarding the filing of the claim.  This information includes the date and time the claim was submitted, the name of the person for whom the claim was filed, and the IP address of the computer, or Internet Service Provider ("ISP") account, that was used to file the claim.

21.  A PUA claimant must answer various questions to establish eligibility for PUA benefits.  The claimant must provide name, social security number ("SSN"), and mailing address.  The claimant must also identify a qualifying occupational status and COVID-19 related reason for being out of work.

22.  After it accepts a UI claim, including a claim submitted pursuant to the PUA program, the EDD typically deposits UI funds every two weeks to an Electronic Benefit Payment ("EBP") debit card administered by BofA, which the claimant can use to pay for his/her expenses.  The EBP card is sent via the U.S. Postal Service to the claimant at the address the claimant provides in their UI claim.  Claimants can activate their debit card over the phone or online.

23.  When receiving regular UI benefits, a claimant must complete a Continued Claim Form (DE 4581) and certify every two weeks, under penalty of perjury, that he/she remains unemployed

and eligible to receive UI benefits.  The EDD authorizes and deposits payment to the EBP debit card after it receives the Continued Claim Form.  On or about April 23, 2020, California Secretary of Labor Julie Su directed the EDD to temporarily suspend the requirement for UI claimants to provide unemployment certifications (Continued Claim Forms).[4]  The Continued Claim Form was waived to prevent any unnecessary delays in dispensing benefit payments.

24.  At present, weekly PUA benefits typically range from $40 to $450.  In order to receive the maximum weekly benefit of $450, a claimant must have earned $11,674.01 or more in the highest quarter of the claimant's base employment period.

25.  The submission of the PUA claims cause mailings to the addresses provided on the claims, including mailings of EBP debit cards administered by BofA that are used to access the fraudulently obtained UI benefits.  The co-schemers and their associates use the EBP debit cards to withdraw the fraudulently obtained UI benefits by making cash withdrawals at Automated Teller Machines ("ATM") and point of sale purchases at merchants across the United States.

C.   **UI Benefit Fraud Schemes**

26.  Based on my conversations with other law enforcement officers, I know that individuals scheming to fraudulently obtain UI benefits generally follow recognizable patterns, including, among other indicia:

---

[4] The temporary suspension of the continued claims forms covered the weeks ending March 14, 2020 through May 9, 2020.

a.   Co-schemers commonly buy or outright steal the personally identifiable information ("PII") of other people to file for fraudulent UI benefits in the ID-theft victims' names and then collect the UI funds.  Co-schemers often buy PII from other fraudsters or from the Dark Web[5] (using cryptocurrency such as Bitcoin) and verify that the PII belongs to real persons by checking the PII at background check websites such as Beenverified, Spokeo, Intelius, and Whitepages.

b.   Using addresses the schemers control as the addresses submitted to EDD for the claims so that EBP debit cards and other EDD correspondence will be mailed to these addresses and thus be accessible to the schemers.  Once the EBP debit cards arrive, co-schemers commonly withdraw UI benefits via ATMs or make POS purchases at merchants for goods and services.

c.   Submitting multiple UI claims from the same IP address for multiple claimants.  These claims are sometimes submitted on the same day close in time.

d.   Failing to provide a phone number or provide a wrong number on multiple UI claims so it may be difficult to reach the identity holder.

---

[5] Dark Web is the set of web pages on the Internet that cannot be indexed by search engines, are not viewable in a standard web browser, require specific means (such as specialized software or network configuration) in order to access, and use encryption to provide anonymity and privacy for users.  Dark Web has become the Internet's black market in recent years where visitors can make illegal purchases of PII, guns, and drugs, and trade child pornography.

IV.  **STATEMENT OF PROBABLE CAUSE**

A.    **SUMMARY OF PROBABLE CAUSE**

27.   The Department of Labor, Office of Inspector General ("DOL-OIG"), California EDD, FBI, Homeland Security Investigations ("HSI"), and United States Postal Inspection Service ("USPIS") are investigating a fraudulent scheme in which the perpetrators fraudulently apply for and obtain UI benefits under the PUA provision of the CARES Act, a provision that is designed to help unemployed individuals obtain UI benefits as part of the nation's response to the economic harms caused by COVID-19.

28.   The investigation initially obtained evidence that at least 47 fraudulent UI claims were submitted to EDD from the same IP address for which the service address was THOMAS's address.  An additional 2 claims were filed from different IP addresses for which the service address was THOMAS's address. These fraudulent UI claims falsely asserted that the named claimants were self-employed independent contractors who were negatively affected by the COVID-19 pandemic, triggering eligibility for UI benefits under the PUA provision of the CARES Act.  The UI claims submitted in furtherance of the scheme falsely reported inflated income to EDD for the named claimants on their applications in order to receive UI benefits.

29.   These fraudulent UI claims were submitted electronically from an IP address registered to M.T. at THOMAS's address on Flint Way in San Bernardino, California.

12

30.  The UI claims filed from the THOMAS's address misrepresented that the named claimants were entitled to UI benefits administered by EDD when, in fact, they were not.  At least 15 of the 49 UI claims submitted using the IP addresses issued to THOMAS's address used names and PII of individuals in custody at California Department of Corrections and Rehabilitation ("CDCR") facilities, including the Richard J. Donovan Correctional Facility in San Diego; the Los Angeles County ("LAC") Facility in Lancaster; and the Sacramento ("SAC") Facility in Represa.  Due to their custody status, those inmates were not eligible to apply for UI benefits as they were not: (1) unemployed through no fault of their own; (2) able and available for work; and/or (3) actively seeking work.  In sum, the 49 UI claims contained material false statements leading to the theft of federal funds designated to provide emergency unemployment benefits assistance.

31.  On February 9, 2021, FBI executed a federal search warrant at an apartment on Flint Way in San Bernardino, California.  THOMAS resided at that location with her fiancé I.M., who was not present during the search.  THOMAS admitted to FBI agents in a voluntary interview that she filed multiple UI claims using other people's PII.  Digital devices seized during the search of THOMAS's residence show that THOMAS discussed on internet-based messaging applications filing and re-certifying fraudulent UI claims in exchange for cash.

32.   The 49 fraudulent UI claims mentioned above caused EDD to disburse over $440,000 in UI benefits from June 2020 to December 2020.

**B.   The Scheme to Fraudulently Obtain UI Benefits**

**1.   <u>DOL-OIG Investigates Public Reports of Fraudulent UI Claims Filed Under California Inmates' Names</u>**

33.   Based on my review of reports, conversations with other law enforcement officers, and my own involvement in this investigation, I know the following.

34.   On or about November 24, 2020, as reported in the New York Times, a task force led by district attorneys in San Diego and Fresno Counties sent a letter to California Governor Gavin Newsom raising concerns about widespread fraudulent UI claims being filed by inmates in California correctional facilities.[6]  On December 1, 2020, as reported in the Los Angeles Times, investigators with the State of California estimated that approximately $400 million had been disbursed on approximately 21,000 suspected fraudulent UI claims filed using the PII of California prison inmates.[7]

35.   Following these reports of fraudulent UI claims using inmate information, DOL-OIG investigated potentially

---

[6] "Unemployment Scam Using Inmates' Names Cost California Hundreds of Millions," N.Y. Times, Nov. 24, 2020, <u>available at</u> <u>https://www.nytimes.com/2020/11/24/us/california-unemployment-fraud-inmates.html</u>.

[7] "California's Prisoner Unemployment Fraud Now Estimated at $400 Million, Officials Say," L.A. Times, Dec. 1, 2020, <u>available at</u> <u>https://www.latimes.com/california/story/2020-12-01/california-prisoner-unemployment-fraud-estimated-400-million</u>.

fraudulent claims using California inmates' PII.
Specifically, DOL-OIG obtained from the CDCR the PII of
inmates housed in CDCR facilities at least since 2018.  The
inmates were those who, due to their incarceration, were
ineligible for UI benefits under the EDD's requirements.
DOL-OIG cross-referenced the inmates' PII with the data
automatically stored by DOL-OIG and EDD for each UI claim
submitted to EDD.  Through this process, DOL-OIG identified
hundreds of UI claims submitted using CDCR inmates' PII.
After identifying the IP addresses used to submit the UI
claims using inmates' PII, DOL-OIG identified instances of
multiple UI benefit claims made (both using inmates' PII and
non-inmates' PII) from the same IP addresses.  In some cases,
DOL-OIG found that a single IP address had been used to file
dozens of UI claims resulting in hundreds of thousands of
dollars of UI benefit disbursements.  DOL-OIG then obtained
from ISPs specific subscriber information for the IP
addresses from which multiple UI benefits claims were filed
using CDCR inmates' PII.

36.  In December 2020, I received information from DOL-
OIG Supervisory Special Agent Michael Blas and SA Christina
Wang about suspected fraudulent UI claims submitted from an IP
address originating in the Central District of California:
172.119.204.253 (the "Target IP Address").  M.T. was listed
as the registered subscriber of the Target IP Address for
which the service address, that is, the physical address, was
THOMAS's address.  DOL database records showed that the

Target IP Address was used to submit at least 47 fraudulent
UI claims to EDD between June and September 2020.

37.   Approximately 15 of the 47 UI claims used PII of
CDCR inmates at the Richard J. Donovan Correctional Facility in
San Diego; the LAC in Lancaster, California; the SAC
Correctional Facility in Represa, California.   Further
investigation into the claims submitted from the Target IP
Address showed that those claims had strong indicia of fraud
as described below.   Two additional claims were submitted in
June 2020 from 75.83.173.103, a different IP address than the
Target IP Address.   The service address for that IP address
ending in 103 during the time the claims were submitted was
THOMAS's address.   One of the 2 claims was for I.M. who was a
federal inmate (Reg. No. 5966xxxx) from in or about March
2020 through October 30, 2020.   Both claims listed THOMAS's
residence as the address for the claims.   The other claim was
for ~~THOMAS and~~ J.T.

**2.**   **<u>The UI Claims Were Fraudulent</u>**

38.   The 15 UI claims submitted using CDCR inmates'
information were fraudulent.   The inmates in custody were not
eligible to apply for UI benefits because they did not meet
EDD's eligibility requirements.   Those inmates were not:
(1) unemployed through no fault of their own; (2) able and
available for work; and/or (3) actively seeking work.

39.   The remaining 32 claims filed from the Target IP
Address, which did not use CDCR inmate PII, also had indicia of
fraud.   Based on my training and experience, I know that

16

individuals scheming to fraudulently obtain UI benefits
generally follow recognizable patterns, including the following,
among others:

     a.   Using the identities of other people to file for
fraudulent UI benefits in the other persons' names and then
collecting the UI funds.

     i.   Generally, in some instances, the named
claimants are victims of identity theft; in other instances, the
named claimants have provided their personal identifying
information to the schemers and have agreed to pay the schemers
a portion of the fraudulent benefits that are obtained; in yet
other instances, the named claimants believe they may be
entitled to benefits but do not know that the schemers are
reporting false information to EDD to fraudulently increase the
amount of the benefits claimed.

     ii.  In this case, only 1 of the 47 UI claims
submitted from the Target IP Address listed a claimant address
that matched the registered address for the named claimant in
open source databases.  In other words, 46 UI claims used
claimant addresses, which did not match the registered address
for those individuals in the Thomson Reuters Clear databases.

     b.   Using addresses the schemers control as the
addresses submitted to EDD for the claims so that EBP debit
cards and other EDD correspondence will be mailed to these
addresses and thus be accessible to the schemers.  Here, EDD
records show that 2 of the 47 claims submitted from the Target
IP Address used THOMAS's address as the claimant's mailing

address, without any apparent connection to the THOMAS's address because they were not for THOMAS, I.M., or any individual observed to reside at THOMAS's address. Nine of the 47 claims submitted from the Target IP Address used the claimant's mailing addresses from the same apartment complex on Base Line Street in San Bernardino, California. California DMV records show that M.T., THOMAS's mother, the ISP subscriber for the Target IP Address, lives at an address on East Base Line Street, San Bernardino, California.

c. Submitting multiple UI claims from the same IP address for multiple claimants and close in time. Here, DOL-OIG identified 47 UI claims that were submitted between June and September 2020 from the Target IP Address, which was leased to THOMAS's address in that time period. Specifically, 26 UI claims had been submitted from the Target IP Address in July 2020, including 12 UI claims filed between July 12, 2020 and July 15, 2020.

d. Providing similar or identical identifying information across multiple different claim applications. Here, the UI claims filed from the Target IP address exhibited the following commonalities:

i. Generally, a single mailing address was used for multiple UI claims submitted on the same day or within a few days of each other.

ii. Two UI claims submitted from the Target IP Address used M.T.'s DMV-registered address on Base Line Street

in San Bernardino, California.  Another 7 UI claims used a different apartment number at M.T.'s registered address.

        iii. Five UI claims used apartments in the same complex located on N. Rockvale Avenue in Azusa, California.

        iv.  The following 3 addresses were used for 9 separate UI claims:

- XXXX Polk Street, Riverside, California 92505;
- XXXX N. Riverside Avenue, Apartment XX8, Rialto, California 92376; and
- XXXX Santa Anita Avenue, Altadena, California 91001.

        v.  Twenty-five UI claims listed no contact telephone number.

        vi.  Four UI claims listed identical phone numbers.  Two listed (323) 691-XXXX, and the other two listed (909) 233-XXXX.

    **3.**   **The Fraudulent Claims Were Connected to THOMAS and Her Flint Way Residence**

    40.  Further investigation revealed that the UI claims discussed above were connected to THOMAS in the following ways:

    a.  Law enforcement databases and Public records showed that THOMAS and M.T. are related and that THOMAS receives mail and resides at the Flint Way apartment in San Bernardino, California.

    b.  Records from Charter Communications, the ISP for THOMAS's address, confirmed that when the UI claims were submitted online from the Target IP Address, the subscriber for the Target IP Address was M.T.  THOMAS admitted in an interview

with the FBI on February 9, 2021, that M.T. was her mother
and that THOMAS had used M.T.'s name but M.T. had never lived
in the apartment on Flint Way.  The service address listed
for the Target IP Address was THOMAS's address.  The username
associated with the account to which the Target IP Address
was issued was "PARISTHOMASXXXX@ICLOUD.COM."  The lease for
the Target IP address was from June 16, 2020 to December 10,
2020.

       c.   Several UI claims submitted from the Target IP
Address used THOMAS's current or prior mailing addresses, as
ascertained in public and law enforcement records, including:

       i.   XXXX Flint Way, #16, San Bernardino,
California.  THOMAS's current mailing address and residence.

       ii.   XXXX East Base Line Street, Apartment
H103, San Bernardino, California.  THOMAS used this mailing
address from June 2018 through July 2019 and was listed as
THOMAS's address as of November 28, 2017.

       iii. XXXX North Riverside Avenue, Apt 628,
Rialto, California.  THOMAS used this mailing address in
March 2019.

    41.  From approximately June 2020 to December 2020, EDD
paid out approximately $440,000 in UI benefits on the claims
that used the same IP addresses associated with THOMAS's
residence.

    **4.   Sample of the Fraudulent Claims**

    42.  I reviewed a sampling 15 of the fraudulent UI claims
discussed above, which were submitted to EDD between June 2020

and August 2020.  The UI claims I reviewed used PII of
incarcerated CDCR inmates.  The inmates had all been
incarcerated prior to 2019 and were still incarcerated through
2020.

43.  The table below sets forth a sample of 6 among the
15 that I reviewed containing fraudulent claims using CDCR
inmates' PII:

| Claimant | Claim Date | Claimed Reason for Unemployment | Claimed Work Was Affected | Claimed Amount | Dates of Incarceration |
|----------|-----------|---------------------------------|---------------------------|----------------|------------------------|
| D.V. | 07/09/2020 | COVID-19 | Barber | Clean Processed ($2,672) | 06/16/2004-PRESENT |
| D.C. | 07/12/2020 | COVID-19 | Barber | Clean Processed ($4,676) | 06/23/2016-PRESENT |
| G.C. | 07/12/2020 | COVID-19 | Carpet Cleaner | Processed [8] | 11/30/2010-PRESENT |
| C.W. | 07/15/2020 | COVID-19 | Final touch-up Painter | Processed | 09/07/2018-PRESENT |
| H.P. | 07/24/2020 | COVID-19 | Final Touch-up Painter | Processed | 4/26/1988-PRESENT |
| J.A. | 07/26/2020 | COVID-19 | Final Touch-up Painter | Clean Processed ($20,020) | 07/28/1993-PRESENT |

44.  All 15 claims were electronically filed from the
above-referenced Target IP Address at THOMAS's address.
Additionally, the UI claims used similar information, as
follows:

---

[8] "Clean Processed" and "Processed" reflect the statuses of
the online UI claim based on EDD records as of December 2020.

a.    The claimant reported being unemployed because of a "disaster," namely, COVID-19, and listed "Laid off/no work" as the reason for unemployment.

b.    In support of the UI claims, the claimants selected the following self-attestation: "Your place of employment is closed as a direct result of the COVID-19 public health emergency" or "You cannot reach your workplace because of a quarantine imposed as a direct result of the COVID-19 public health emergency."  One claim selected "You cannot reach your workplace because your health care provider advised you to quarantine due to COVID-19 concerns."

c.    Thirteen UI claims did not list work or home telephone numbers.

d.    Several of the UI claims using inmate PII entered identical responses into the fields requesting information about claimants' "occupation" and "other skills."  For example, 5 UI claims listed "Hair Stylist/Barber or Barber;" 7 claims listed "Final Touch-up Painter;" and 2 claims listed "Carpet Cleaner."

**5.    Federal Search Warrant Executed at THOMAS's Residence**

45.  On February 9, 2021, the FBI executed a search warrant THOMAS's residence on Flint Way in San Bernardino, California.  The search warrant (5:21-MJ-26) was issued by the United States District Court for the Central District of California and signed by the Honorable Sheri Pym, United States Magistrate Judge.  During the search, the FBI seized two EDD cards, THOMAS's digital devices, and a notebook filled with PII for over 40 people.

46.   On February 9, 2021, after the execution of the above-reference search warrant, FBI SA Stephen Harrison conducted a voluntary interview of THOMAS under the carport area of her residence in a vehicle.  THOMAS told us the following:

a.   M.T. is THOMAS' mother.  M.T. never lived in the Flint Way apartment.

b.   THOMAS is employed as a caregiver through In-Home Supportive Services ("IHSS") for her mother and another client named S.H. THOMAS previously had two additional clients, V.D. and H.E.

c.   THOMAS has been employed throughout the COVID-19 pandemic with the exception of a little over two weeks when THOMAS stated that she had been infected with COVID-19.

d.   THOMAS stated that she went to both of her clients every day except for Sundays for her mom.  M.T. had not been employed for several years.  THOMAS submitted her timecards on-line to IHSS.

e.   THOMAS applied for unemployment because she needed money and thought she had worked for it.  She applied for it and EDD approved it.  She did not claim a COVID-19 or any pandemic-related reason.  I.M. did not live with THOMAS at the Flint Way address until December 2020 when I.M. was released from prison.

f.   THOMAS admitted that I.M. received an UI benefit card at her residence on Flint Way, but THOMAS claimed that someone else had applied for UI benefits using I.M.'s

information.  Once I.M. was released for custody, he used his own card.

g.   THOMAS's ISP is Spectrum and the account is under M.T.  THOMAS confirmed her e-mail address was the same e-mail address associated with the Target IP Address.

h.   THOMAS admitted to helping other people file UI claims in exchange for payment.  Specifically, she stated "I did it, and it just was to have extra money."  THOMAS created the login credentials for other people, filed their UI claims, and a few days later the person for whom she filed the UI claim would receive a letter of approval.

i.   THOMAS directed the EBP debit cards to be sent to the addresses specified by those who paid her to file UI claims because she knew that all those EBP debit cards could not be sent to her residence.

j.   THOMAS was paid to file the UI claims after the EBP debit card was delivered to a third party.  THOMAS received payments in cash or through the internet-based "Cash" mobile application.  After THOMAS received payments for filing the UI claims, she provided the individuals for whom the payments were issued with the login information for the account.

k.   When THOMAS filed multiple UI claims under the same claimant address, she did not submit all the claims at once.  THOMAS claimed that she established a "rhythm" of placing gaps in time to filing the claims, which she believed helped them get approved.  THOMAS knew that she could not use same address or EDD would flag it.

l.     Eventually THOMAS stopped filing UI claims because she "felt bad."  THOMAS kept paper records for the people who did not get approved in a green folder in her apartment residence.

m.    THOMAS denied that I.M. was involved with the scheme.

47.  Also on February 9, 2021, I reviewed with THOMAS 49 names on the UI claims filed from the Target IP Addresses corresponding to the THOMAS's residence.  During this review, THOMAS stated that she recalled filing UI claims for at least approximately 34 of the individuals that appeared on the list. THOMAS, however, stated that she did not believe all of the UI claims she filed that appeared on the list of 49 were approved to receive UI benefits.

**6.   Digital Device Analysis**

48.  During the February 9, 2021 execution of the search warrant three digital devices were seized.  After February 9, 2021, pursuant to the same search warrant, I reviewed two digital devices that were seized from THOMAS's residence: one cellphone (Apple_iPhone) and one laptop computer.  I was not able to review one cellular telephone, which was also seized. THOMAS's cellphone showed that she had conversations with various individuals about EDD claims.  THOMAS worked with other people to file UI claims and had others help her acquire PII, which she used to file UI claims.  On the two devices that I was able to search, the following evidence was found:

a.   In the Notes section of the Apple iPhone, I found the following text:

*"So I would need your full name exactly how it's shown on your social security card*

*D.O.B*

*DL#*

*And SS#*

*Email address*

*I can get you back 10,000 or more I charge 3,000 once the card comes . . .   I will be able to tell if you'll get approved right away once I put the application through . . .   Everything once your approved takes 2 weeks sometimes it comes sooner If your out of state or in Cali I will activate your card and pull my 3,000 off mail or bring the card in person If in Cali . . .   If you want to proceed after Reading this send me all your information I'll register you a link will be sent to your email once you receive the link click on it and I'll take it from there your claim will be ready to be filed and once I complete the app you will know instantly."*

The above note appears to outline the procedures THOMAS used to file fraudulent UI claims for individuals who had requested her assistance.

b.    I also found various screenshots on the Apple iPhone and the laptop computer that showed images of conversations on messaging applications.  At least 18 screenshot images of a conversation with a contact identified as "Damion" contained what appear to be PII for over 34 people.  Approximately 20 of the names and identifiers listed in the screenshots matched the names listed on the claims for the Target IP address (47 claims).  The dates listed on the message applications ranged from "Jun 21" to "Aug 4" although not all images of the text messages showed the date.  The PII for 13 of the 15 inmates was also included in the 34 names I saw on the screenshot images of text conversations.

c.    Another screenshot of text conversations with a contact identified as "DAMION" dated "July 26" appeared to contain dates of birth, social security numbers, and various personal identification numbers and addresses.  The texts also showed blue text which reads "Roger F. was approved. . .," "Icon (Pasadena California) finally got it," and "Recertified TODAY" followed by a list of names.

d.    Based on my participation in this investigation and my training and experience, I interpret the above text messages with "DAMION" as showing that THOMAS received PII and addresses from "DAMION" to file EDD claims.  The messages also show that THOMAS continued to have on-going communications with "DAMION" regarding the re-certification process required by EDD every two weeks to continue receiving UI benefits.

e.   In the iMessage application (a text messaging application) on the Apple iPhone, I found more references to filing and re-certifying UI claims.  Several of these messages were between "Meme" (626) 421-XXXX and "Self" (ParisthomasXXXX@icloud.com).  For instance, one message read, "11-29-2020 Paris to Meme Hey let Dan dog know the 13 teen ppl is certified today."  Another message read, "12-01-2020 from Self (paristhomasXXXX@icloud.com) to MEME "Hey bitch so I was wonder is it ok to cash app me the $600 for December certifications it don't have to be today and you keep the $50 for the phone bill.""

f.   Based on my participation in this investigation and my training and experience, I interpret the iMessage text messages above, along with additional messages found on the devices, that THOMAS requested a $3,000 fee for filing a UI claim and an additional $650 to certify a group of claims from other co-conspirators who benefited from the EDD benefits.

g.   Text messages on the Apple iPhone also show conversations between THOMAS and others about re-certifications and UI claims through February 2021.  Indeed, on February 3, 2021, just six days before the FBI executed the search warrant at THOMAS's residence, THOMAS sent a message via iMessage to "Meme," which read, "When I get home I'll have to go through each one again go see out of 13 I've already say and certified 7ppl that say pending I'll text you the names when I get home."

h.   Additionally, in the Notes application on the Apple iPhone, one file was titled "Total Amount From Beginning."

28

The note listed names and dollar amounts next to several names which matched the names on the list of 47 UI claims.  The note also stated, "TOTAL FUNDS GIVEN TO MEME $12,000," "PARIS $3,500," and "PARIS MOM FOR ADDRESS $500."  There were additional amounts for supplies like gas and ink.

       i.  Several photographs on the Apple iPhone and laptop computer showed identification cards for people other than THOMAS.

    49.  As part of the execution of the search warrant, I reviewed both the digital and hard copy documents seized from THOMAS, which appeared to be letters from EDD addressed to people whose names matched the UI claims associated with THOMAS's Target IP Address.

    7.  **REVIEW OF EBP DEBIT CARD STATEMENTS**

    50.  On March 30, 2021, I reviewed a spreadsheet prepared by FBI Forensic Accountant Stacy Martin that compiled data from BofA account statements connected to at least 30 UI claims filed from THOMAS's IP Address.  The BofA statements showed accounts that were funded by the EDD as a result of the UI claims.  The BofA data showed a pattern of transactions consistent with identity theft and fraud based on my training and experience.

    51.  Specifically, the summary of BofA transactions show that between June 2020 and December 2020, multiple ATM cash withdrawals were made from the same BofA locations in Colton, Loma Linda, and Grand Terrace, California, all within 11 minutes of THOMAS's residence.  Most of the ATM cash withdrawals were for the amount of $1,000.  For instance, on July 11, 2020, two

BofA accounts linked to UI claims made from THOMAS's IP address each made $1,000 ATM cash withdrawals from a BofA location in Loma Linda within 2 minutes of each other.  Similarly, three days later, on July 14, 2020, two BofA accounts linked to UI claims submitted from THOMAS's IP address each made a $1,000 ATM cash withdrawal and a $500 ATM cash withdrawal from a BofA location in Loma Linda within 4 minutes of each other.

## V. <u>CONCLUSION</u>

52.  For all the reasons described above, there is probable cause to believe that THOMAS has committed violations of Title 18, United States Code, Sections 1040 (Fraud in Connection with Emergency Benefits) and 1343 (Wire Fraud).


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  2nd  day of April 2021.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE